**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| John Baemmert, | Case No. 3:16-cv-00540-jdp |
| Plaintiff, | |
| v. | **REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Credit One Bank, N.A., | |
| Defendant. | |

## I.    INTRODUCTION

Plaintiff John Baemmert ("Plaintiff") has moved this Honorable Court for an Order granting him summary judgment, pursuant to Fed. R. Civ. P. 56, because Defendant Credit One Bank, N.A. ("Defendant") violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*., and invaded Plaintiff's privacy in violation of Wisconsin Statute § 995.50, by repeatedly and automatically calling his cell phone at least 63 times over 12 days without his prior express consent. In an attempt to avoid liability for yet another TCPA lawsuit against it,[1] Defendant's obstructionist approach has been to withhold discovery, deny having a record of the subject calls, inject self-serving declarations from witnesses who have never been disclosed, point out typos, and, worst of all, attack Plaintiff's character.[2] Despite Defendant's attempt to distract this Court with immaterial and irrelevant facts, Plaintiff has proven the truth, which is

---

[1] According to PACER.gov, Credit One Bank has been sued 138 times in federal court since the inception of this lawsuit on August 1, 2016. Many of those lawsuits involve allegations that Defendant violated the TCPA

[2] "The parties and their attorneys must at all times treat everyone involved in this lawsuit with courtesy and consideration. The parties must attend diligently to their obligations in this lawsuit and must reasonably accommodate each other in all matters so as to secure the just, speedy and inexpensive resolution of each proceeding in this matter as required by Fed. R. Civ. Pro. 1. Failure to do so shall have consequences." ECF No. 8, p. 1.

that Defendant unjustifiably harassed Plaintiff, a wrong party, with automated collection calls until he could no longer take it.

## II.    LEGAL STANDARD

Summary judgment is appropriate when a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Oxbo International Corporation v. H&S Manufacturing Company, Inc.*, 2017 WL 2272060, at *5 (W.D. Wis., 2017)(citing Fed. R. Civ. P. 56(a)). Where, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of ... the non-moving party.' " *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendant's own lack of evidence and its baseless attacks certainly do not create material disputes over anything that might affect the outcome of this suit. Nothing that Defendant has put forward has created anything more than a metaphysical doubt, if that, as to any fact Plaintiff has proven. Since the court's "favor toward the nonmoving party does not relieve it of the obligation to "do more than simply show that there is some metaphysical doubt as to the material facts," Plaintiff's motion for summary judgment should be granted. *Springer v. Durflinger*, 518 F.3d

479, 483 (7th Cir. 2008)(citing *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir.1996))(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.    ANALYSIS

The TCPA prohibits making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service . . . or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii). Here, Defendant did not have Plaintiff's prior express consent to call Plaintiff's cell phone with an ATDS and Defendant's repeated calls were not made for emergency purposes. These facts are uncontested and undisputed. Plaintiff's Supplemental Proposed Findings of Facts ("PSPFF") ¶¶8-12.

### A.    The cell phone number of Plaintiff that Defendant repeatedly called, which propagated this lawsuit, is 414-600-5486.

Defendant's counsel acknowledged at Plaintiff's deposition that he believed there was a "typo" in some of Plaintiff's documentation in this case that had Plaintiff's cell phone number listed as -54*68* instead of -54*86*. ECF No. 30, p.11, deposition p.31, lines 16-20. Yet, Defendant begins its brief in opposition to Plaintiff's motion for summary judgment with the argument that this "typo" makes Plaintiff's documents inherently unreliable and thus precludes summary judgment in his favor. ECF No 22, p.3.

To clarify, Plaintiff's cell phone number is 414-600-5486; this is the same cell phone number that Defendant autodialed 63 times in 12 days and the same number listed in Plaintiff's complaint and understood to be Plaintiff's cell phone number by Defendant throughout this

lawsuit. ECF No.1, p.5, ¶21; Exhibit C to Affidavit of Attorney Patrick J Helwig - 08/16/2016 Email Correspondence with Tiffany L. Collins. Defendant boldly points out this scrivener's error despite making its own litigation mistakes along the way that should not go unnoticed. For one, Defendant, too, lists the wrong number for Plaintiff in its Proposed Findings of Fact, alleging that Plaintiff's counsel sent subpoenas with the number 414-*877*-5486, when in fact the subpoenas were sent with the correct number, 414-*600*-5486. ECF No. 25 ¶8. Moreover, Plaintiff's typo is hardly noticeable when compared to Defendant's public filing of Plaintiff's unredacted, full credit card number on PACER, which is what Defendant did, despite clear warning from Plaintiff's counsel to "REDACT PERSONAL IDENTIFIERS IF FILING." ECF No. 21, formerly ECF No. 18-4. Defendant also attempted to gain an advantage in this case with a late-disclosed expert report. On April 21, 2017, thirty-five days after the due date for a proponent's expert report under the Court's Scheduling Order, Defendant served Plaintiff with a 161-page proponent's expert report. After Plaintiff notified Defendant of the untimely disclosure, Defendant finally relented and agreed to withdraw the expert report, but not until after Plaintiff spent unnecessary time drafting a motion to strike. Finally, in the face of Plaintiff's Motion for Summary Judgment, Defendant has now injected two self-serving declarations from Ryan Hunt and Amy Nicole Hernandez, material witnesses who have heretofore never been disclosed to Plaintiff as required by Fed. R. Civ. P. 26(a)(1).[3]

---

[3] Unfortunately, Defendant's entire approach in litigating this case seems to have been to obfuscate, delay, and refuse to produce any evidence in support of its defenses until after Plaintiff filed for summary judgment. By way of example, despite several good faith meet-and-confers on discovery issues over several hours, Defendant never once advised Plaintiff that it was confused about whether Plaintiff's number was -5*486* or -5*468*. Instead, Defendant first raised this issue in its response to Plaintiff's motion for summary judgment and at Plaintiff's deposition. Defendant sought clarification despite the fact that the correct telephone number appeared in the original Complaint filed herein. ECF No. 1. It is frankly disingenuous for Defendant to suggest that there was any real confusion over Plaintiff's telephone number.

**B.** **Defendant caused calls to be made to Plaintiff's cell phone using an ATDS in violation of the TCPA and Wis. Stat. § 995.50 and is liable for those calls.**

Defendant takes the position that it cannot "locate the calls" to Plaintiff and, from that, concludes that it did not make the calls to Plaintiff.[4] ECF No. 16, p. 2; PSPFF ¶20. Defendant doubles-down on this defense by assuming, since Defendant has produced no record of the calls, that Plaintiff cannot prove Defendant used an automatic telephone dialing system ("ATDS") to make the calls to Plaintiff's cell phone. However, one need not look any further than the statements of Defendant's own representatives during calls with Plaintiff to discredit these positions. After Plaintiff provided his cell phone number to Defendant's representatives in 5 separate conversations, asking them to stop calling, the representatives responded in the following ways: "I'll take this number out, sir;" "Okay, sir. We will do that, sir. I do apologize;" "I am going to take out this phone number;" and "Regarding the phone calls, I will put proper action regarding that one and really sorry for the inconvenience." ECF No. 11 ¶¶ 5-40. And, most tellingly, when Plaintiff asked Defendant's representative to stop calling, but then

---

Moreover, this undersigned counsel had email exchanges with the Defendant's Legal and Compliance Specialist on August 16, 2016 wherein this telephone number was provided to her and therefore Defendant was undoubtedly aware of the correct number 414-600-5486. Exhibit C to Helwig Affidavit - 08/16/2016 Email Correspondence with Tiffany L. Collins. All of that said, Plaintiff's cell phone number is 414-600-5486.

[4] One defense floated by Defendant, that these robocalls were forwarded to Plaintiff from another number, is absolutely implausible. ECF No. 22, p. 6, fn. 1. If this were to be believed, some phantom person would have had to have selectively forwarded at least 10 different phone numbers belonging to Defendant to Plaintiff's cellular telephone number. Plaintiff stated at his deposition that he was not getting unknown or unwanted calls from *any* other source on his cellular telephone. PSPFF ¶74. In other words, Defendant's phantom person who allegedly might have call-forwarded some phone numbers to Plaintiff would not have forwarded *all* of their calls to Plaintiff, just these 10 selected numbers. That is highly unlikely given that there is no evidence that Plaintiff, a single dad with a 15-year old son, knew anyone with a Credit One Bank credit card. PSPFF ¶75-76. It is also improbable to think that this phantom person would take the time to individually program their telephone to selectively forward to 10 different Credit One Bank phone numbers, and only those, to Plaintiff's cellular telephone.

accidently provided the wrong number, Defendant's representative could not locate the number and responded that this was the wrong number. ECF No. 11 ¶12. When Plaintiff then provided his correct cell phone number, however, Defendant's representatives located the cell phone number every time because it was in their calling system. ECF No. 11 ¶¶ 5-40. From this evidence alone, a reasonable fact finder could only conclude that Defendant was, in fact, making the calls to Plaintiff's cell phone.

If this evidence were not enough, though, there is much more. Plaintiff's caller ID shows that he received calls from ten different phone numbers: 212-453-4445, 469-904-7308, 470-225-2557, 480-444-2421, 612-486-0973, 719-696-6175, 732-867-2870, 855-306-4247, 866-473-0948, and 973-796-2481. Defendant, itself, acknowledged that these ten phone numbers belong to two of its vendors that make automated collection calls on its behalf: First Contact, LLC c/o iQor ("iQor") and iEnergizer. PSPFF ¶19. Subpoena production from Level 3 Communications proves further that Defendant's call vendor, iQor, was assigned to at least 3 of the 10 phone numbers that called Plaintiff's cell phone. ECF No. 18-8. Plaintiff also traced these ten phone numbers back to Defendant Credit One Bank. PSPFF ¶¶17-18 26.[5]

In response, to counteract all of this evidence that these ten phone numbers belong to Defendant, Defendant has produced nothing. Defendant has produced exactly *zero* documents in response to Plaintiff's 32 separate requests for production of documents, making only generic objections and refusing to produce anything to support its defenses. Defendant also sent three other subpoenas to third parties NovaTel, Ltd., Inc., Teleport Communications America, LLC, and U.S. Telepacific Corp., but has apparently never received a response from these third parties

---

[5] To date, the Court may take judicial notice of the fact that when each of these ten phone numbers are called, they still lead to a representative that identifies the called number as belonging to Credit One Bank.

or compelled them to disclose these subpoenaed documents. Instead, Defendant has relied on clever wording and strained semantics to move its arguments. For example, Defendant's motion for summary judgment states that "it has no records of making these calls" to Plaintiff. ECF No. 16, p. 2. Notice that Defendant does not state that it did not *make* these calls--only that it has *no records* of making them. Further, in its response to Plaintiff's motion for summary judgment, Defendant also provided a self-serving declaration from undisclosed witness Ryan Hunt that said, "Credit One has not been assigned the [ten] telephone numbers," and "Credit One . . . is unable to locate any record of making calls at any time to 414-600-5486." ECF No. 20 ¶¶5-6. Technically, it might be a *literally* true statement that Defendant was not assigned those numbers because those numbers were assigned to Defendant's calling vendors and dialing agents, who in turn were making automated calls for the Defendant. Even so, Defendant appears to use this word play to try and hide behind its dialing agents, but that does not lead to the conclusion that Defendant is not liable for these automated calls to Plaintiff. *See In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd 559, 565 (F.C.C. 2007)("Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call."). Moreover, while it is one thing to say that it cannot "locate the calls," it is an entirely different thing to say that neither Defendant nor its agents made these calls to Plaintiff. Defendant does not deny that it and/or its agents *made* the calls to Plaintiff, it, instead, claims that it *has no record* of the calls.[6]

In regard to Defendant's no-record-of-calls defense, to or from Plaintiff's cell phone

---

[6] "A **non-denial denial** is a statement that, at first hearing, seems a direct, clearcut and unambiguous denial of some alleged accusation, but on carefully parsing turns out not to be a denial at all, and is thus not explicitly untruthful if the allegation is in fact correct. It is a case in which words that are literally true are used to convey a false impression." Source: https://en.wikipedia.org/wiki/Non-denial_denial last accessed June 5, 2017.

number 414-600-5486, it simply does not add up. Plaintiff made at least four calls to Defendant's collectors from his cell phone, yet Defendant cannot find any record of these inbound calls either. ECF No. 11-1, pp. 15-16.  In other words, Plaintiff has proved that he called Defendant and that its collectors answered him on his cellular telephone, but Defendant cannot locate those records. This speaks volumes about Defendant's recordkeeping. The only reasonable explanation for the fact that Plaintiff can prove that he called Defendant, but that Defendant does not have a corresponding inbound call record from Plaintiff's cell phone, is that Defendant deleted *all* of its call records that included the telephone number 414-600-5486. Toward the end of Defendant's robocalling campaign, Plaintiff advised Defendant that he was going to sue them, had retained a lawyer, gave them the lawyer's name and phone number, and demanded to know the specific address and name information from Defendant's collectors. PSPFF ¶73. That was more than sufficient notice, incentive, and motive for Defendant to get rid of its own records of all phone calls it made or received associated with the number 414-600-5486.

Regarding the issue of whether Defendant used an ATDS to call Plaintiff's cell phone, again, the admissions of Defendant's collection representatives themselves discredit Defendant's own position. During a call on February 3, 2016, Plaintiff asked Defendant's representative, "Why are you calling from different area codes, too? Explain that." ECF No. 18-11, p.5, deposition p. 17, lines 21-22. To this question, Defendant's representative responded, "***That's a computerized dialing system***." *Id*. at lines 23-24. Based on this admission alone, a reasonable fact finder could only conclude that Defendant was using an ATDS to call Plaintiff's cell phone. Once again, if more evidence of this simple fact is needed, there is more to be had.

Congress defined an ATDS as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B)

to dial such numbers." 47 U.S.C. §227(a)(1). A predictive dialer is an ATDS under the TCPA. *See In the Matter of Rules and Regs. Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd 559, 565-566 (2008); *see also Nelson v. Santander Consumer USA, Inc.*, 931 F. Supp. 2d 919, 930 (W.D. Wisc. 2013) vacated, No. 11-CV-307, 2013 WL 5377280 (W.D. Wis. June 7, 2013) ("Under both the statute and the order, the question is not how the defendant made a particular call, but whether the system it used had the 'capacity' to make automated calls."). Further, the FCC went on to emphasize that a system that has "the capacity" to store or produce numbers for dialing meets the test for an ATDS even if that capability is not being used at the time a particular call is made:

> We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of an 'autodialer') ***even if it is not presently used for the purpose***, including when the caller is calling a set list of consumers.

*In re Rules and Regs. Implementing the Telephone Consumer Protection Act of 1991*; 30 FCC Rcd 7961 (2015), 30 FCC Rcd at 7971-72, ¶10 (emphasis added).

Defendant's discovery responses admit that it uses third-party vendors iQor and iEnergizer to provide it with predictive dialing, auto-dialing, robotic-dialing, automated-messaging, text-messaging, emailing, long distance telephone services, VOIP, or similar services. PSPFF ¶16. Defendant's Vice President of Collections, Gary Harwood, also testified in another TCPA lawsuit that iQor and iEnergizer make calls for Defendant using only aQrate and Aspect Unified IP, which are dialing systems that have the capacity to predictively dial numbers.[7] PSPFF ¶¶30-38. Mr. Harwood understands and admits that these dialing systems used

---

[7] Defendant's claim that Mr. Harwood's deposition testimony in another lawsuit is irrelevant and not properly before this Court is wrong on both counts. One, Fed. R. Civ. P. 32(a)(3) allows an adverse party to use, "for any purpose," the deposition of a party's Rule 30(b)(6) witness. Two, the protective order in that case clearly does not preclude the filing of Mr. Harwood's deposition,

to call Credit One Bank's customers are predictive dialers. PSPFF ¶39. The aQrate dialing system used in this case by iQor to call Plaintiff on Defendant's behalf has already been held to be an ATDS. *Morse v. Allied Interstate*, 65 F. Supp. 3d 407, 410 (M.D.Pa. 2014). The telephone systems utilized by Defendant clearly have the *capacity* to predictively dial telephone numbers as admitted by the testimony of Mr. Harwood. PSPFF ¶41. So, even if Defendant were to claim (which it has not) that the calls made to Plaintiff were dialed manually, those calls would still have been placed through dialing systems that have the *capacity* to randomly and sequentially dial telephone numbers, thus making them automatic telephone dialing systems subject to the TCPA.

In addition to all the above, Defendant requires its customers to agree to autodialed calls within its cardholder agreement. *See e.g. A.D. v. Credit One Bank, N.A.*, 2016 WL 4417077, at *1 (N.D.Ill. Aug. 19, 2016); *Boule v. Credit One Bank*, 2016 WL 3015251, at *1 (S.D.N.Y. May 11, 2016). Moreover, Plaintiff testified that there was a noticeable period of dead air with no live person on the other end of Defendant's calls, and he received calls from Defendant multiple times in a day and throughout the day; on multiple occasions receiving seven (7) calls from Defendant in a single day. PSPFF ¶¶42-43, 80. Defendant argues in its motion that allegations of dead air, clicks and delays after answering a call are not enough to survive summary judgment on the ATDS issue. However, there is much more evidence than that here. When dead air,

---

but even if it did, Defendant waived its claim of protection by not timely filing a motion to seal in that action. In fact, Defendant itself cited to this publicly filed deposition testimony of Mr. Gary Harwood in its written arguments filed with the court to stay the underlying case. *See* 16-CV-00173 (D.Minn. Oct. 25, 2016), ECF No. 57, p. 6. Having now argued from the very same public testimony of Mr. Harwood, Defendant can hardly now be heard to complain about its very public existence. Defendant, represented by this same counsel, could certainly have made a motion to seal this record if had so desired. In fact, Defendant did that very thing when it filed Plaintiff's unredacted full credit card number in this case and then subsequently scrambled over the Mother's Day weekend to repair the damage it had done to Plaintiff's financial privacy. *See* ECF Nos. 18-4 versus 21, p. 4.

pauses, and multiple calls in a single day are combined with a term in Defendant's cardholder agreements requesting consent to make autodialed calls, testimony from Defendant's Vice President of Collections that it uses an ATDS, and its collection representative *admitting* to the use of a "computerized dialing system," this evidence is more than speculation and bare allegations; it overwhelmingly demonstrates that Defendant used an ATDS to call Plaintiff's cell phone.

Defendant' next argument, that Plaintiff did not allege vicarious liability for the calls of its agents, is wrong, but provides a good opportunity to further explore Defendant's discovery tactics. To start, Plaintiff *did* allege in his Complaint that Defendant is liable for any calls made on its behalf by a third party. *See e.g.* ECF No. 1 ¶¶41-43. Next, Defendant argues that Plaintiff missed the deadline for amending his complaint but fails to tell the whole story. In truth, Defendant withheld evidence demonstrating any involvement from any third-party until well *after* the deadline to amend had already passed. Plaintiff did not know that there were third parties making calls on Defendant's behalf. After all, the collection agents that spoke with Plaintiff on the recorded collection calls repeatedly identified themselves as "Credit One Bank." *See generally* ECF No. 18-11; ECF No. 11 ¶51.

Moreover, Defendant's Rule 26(a)(1) Disclosures, served on October 11, 2016, disclosed only Plaintiff, an "unknown Rule 30(b)(6) representative," and an "unknown cell phone provider" as individuals likely to have discoverable information. Exhibit A to Helwig Affidavit. Defendant's initial disclosures have *never* been supplemented. Defendant's first responses to Plaintiff's discovery requests were also completely evasive and, despite being asked, made absolutely no mention of a third-party who made calls on Defendant's behalf. *See generally* ECF No. 12-1. The first time Defendant provided any information regarding the involvement of iQor

and iEnergizer was with its supplemental responses to Plaintiff's discovery requests. Exhibit B to Helwig Affidavit. Not only were Defendant's supplemental responses not served until December 22, 2016 (34 days after the pleading amendment deadline), but also they were *never* verified or signed by Defendant as required by Fed. R. Civ. P. 33(b)(5). *Id*. In other words, Defendant completely withheld any information involving a third-party dialing vendor until well after the pleading amendment deadline had passed, and then only with late, unexecuted discovery responses. Defendant should not be allowed to benefit for its failure to cooperate in discovery. Further, Defendant should not reap the rewards of this 11th-hour defense that now completely lacks any admissible evidence to support it.

With all of that said, Defendant is nevertheless liable for the automated collection calls that it hired its agents to make to Plaintiff on its behalf in any case. *See In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd 559, 565 (F.C.C. 2007)("Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call."); *see also CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. Ill. 2010)(ruling that, due to the Hobbs Act, the FCC Order cannot be challenged in the District Courts.) This Court has ruled that because of the Seventh Circuit's ruling in *CE Design,* it "borders on frivolous" to attempt to challenge this FCC Order in a District Court. *Nelson*, 931 F. Supp. 2d at 930 (W.D. Wisc. 2013) vacated, No. 11-CV-307, 2013 WL 5377280. Additionally, in 2013, the FCC issued its *Dish Network Order* concluding that the TCPA allows sellers to be held vicariously liable for the conduct of their third-party agents making telemarketing calls. *See In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574 (2013); *aff'd*, *Dish Network L.L.C. v. FCC*, 552 Fed. App'x 1 (D.C. Cir. Jan. 22, 2014).

Defendant claims that there is no evidence in the record to support a principal-agent

relationship between Defendant and its dialing vendors, but that is entirely untrue. Mr. Harwood testified that iQor is a third-party servicer for Defendant that provides collections for Credit One Bank and calls customers to secure payments on past due accounts. PSPFF ¶32. Mr. Harwood further testified that iEnergizer is a third-party outsource vendor who provides collections for Defendant, and that both vendors call customers on Defendant's behalf. PSPFF ¶33. Defendant provides these vendors with customer information, including phone numbers, and directs them to call those numbers. PSPFF ¶34. When iQor and iEnergizer make calls on Defendant's behalf, they identify themselves as "Credit One Bank." PSPFF ¶35. There is no better evidence of the existence of this principal-agent relationship than the fact that Defendant makes iQor and iEnergizer use only its name, Credit One Bank, when making calls on its behalf and when making calls that they were directed to make by Defendant. All calls made to Plaintiff in this case were made by agents who themselves repeatedly admitted that they represented Defendant Credit One Bank. As such, Defendant is liable for those illegal automated calls to Plaintiff's cell phone.

### C. The TCPA applies to the robocalls that Defendant repeatedly made to Plaintiff's cell phone number 414-600-5486 because his cell phone is both connected to a cellular service and to a service for which he was charged for Defendant's calls.

The TCPA prohibits a party from using an ATDS to call: (1) any cell phone; or (2) any other phone "for which the called party is charged for the call." 47 U.S.C. § 227(b) (1)(A)(iii). In the present case, Plaintiff's cell phone, along with his TextMe service, falls under both of these provisions. No doubt, Plaintiff's cellular phone is not only connected to a cellular telephone service, but also to a service for which Plaintiff is charged for each call. PSPFF ¶¶55, 78-79, 81, 84.

Despite Defendant's contention that Plaintiff's phone is somehow not a cell phone or not connected to a cellular telephone service, Plaintiff's phone is, in fact, connected to a cellular telephone service. PSPFF ¶50, 81. Plaintiff purchased his existing Cellular One Samsung cellular telephone in the early part of 2015 and, sometime thereafter, downloaded an app on his cell phone called TextMe. PSPFF ¶¶49,82. Plaintiff's use of the TextMe app in no way prevents Plaintiff's phone from being connected to a cellular telephone service. PSPFF ¶50, 81. To the contrary, Plaintiff's cell phone was and is connected to and operational on the cellular telephone network. On one occasion, Plaintiff had to call 911 with his cell phone, not using the TextMe app, and was successfully connected to the Milwaukee Police Department through the Cellular One cellular telephone service. PSPFF ¶¶50, 84. Defendant latches on to the fact that Plaintiff uses an app, TextMe, for telephone calls and texts, but mistakenly assumes that the use of the TextMe app somehow prevents the telephone from being connected to a cellular telephone service. Plaintiff's phone is, and always has been, usable through the cellular telephone network and, as such, is a *cell phone* just as Defendant's counsel described it countless times during Plaintiff's deposition. *See generally* ECF No. 30.

Moreover, when Plaintiff makes or receives calls on his cellular telephone through TextMe, he is charged credits. PSPFF ¶¶56, 78-79. Those credits are Plaintiff's valuable property that he has either directly paid for or earned by spending time watching advertising videos; Plaintiff has done both. PSPFF ¶¶57, 85. Plaintiff has made multiple $10.00 purchases of credits from TextMe on this cellular telephone, both before and after this lawsuit was filed, and has also obtained service credits earned by watching advertising videos. PSPFF ¶53, 85-86. Every time Defendant called Plaintiff's cellular telephone, it cost him credits for which he had paid. PSPFF ¶¶56, 78-79.

In its response to Plaintiff's motion, Defendant relies heavily on the self-serving Declaration of Amy Nicole Hernandez, the Chief Financial Officer of TextMe, to argue that Plaintiff was not charged for the calls made to him by Defendant. Not only is this untrue, however, but the Declaration of Ms. Hernandez should not be considered by this Court for a number of reasons. One, Ms. Hernandez has never been disclosed as a witness in Defendant's Rule 26(a)(1) Disclosures; that alone should nullify this declaration. Two, Defendant essentially took deposition testimony from Ms. Hernandez and transcribed it into a declaration without providing any notice to Plaintiff, thus making it impossible for Plaintiff to cross examine her. Three, the Hernandez declaration lacks sufficient evidence or foundation to establish her credibility to testify regarding cellular telephone services. Four, the Hernandez declaration goes way beyond a custodial records affidavit and appears to be another attempt by Defendant to introduce a late expert report well passed the expert disclosure deadline. Five, Defendant produced this declaration eight days *after* Plaintiff had already moved for summary judgment. In sum, Defendant did not disclose Ms. Hernandez as a lay witness or an expert, has never given notice of the taking of her deposition, and has produced her self-serving declaration only in response to Plaintiff's motion for summary judgment. For these and all the reasons above, Defendant should be precluded from using her declaration.

Moreover, the reliance on the declaration of Ms. Hernandez is misplaced. Ms. Hernandez states that "Inbound calls to the TextMe app were free in 2015 and 2016." ECF No. 19 ¶3. Defendant, then, misleadingly injected the term "credits" into its proposed findings of fact, saying that "users of the TextMe app were not charged money or credits for inbound calls," which misstated Ms. Hernandez's Declaration. *compare*, ECF No. 19, ¶3 with ECF No. 17, ¶15. While one might try to argue that inbound calls may have been "free" in the sense that Plaintiff

was spending phone credits that he had *earned* from watching advertising videos, they were not "free" when he was spending credits that he had *purchased* on those same calls. Plaintiff repeatedly testified that he spent money to buy these credits, which were consumed when he made or received inbound phone calls on his cellular telephone through the TextMe App. PSPFF ¶¶56, 78-79.

Defendant goes to great pains to try and characterize inbound calls to Plaintiff's telephone number 414-600-5486 as "free." Nothing could be further from the truth. Plaintiff paid for the cellular telephone on which he received these robocalls, he paid for the Wi-Fi service in his home for these robocalls, and he paid for the energy necessary to recharge his cellular telephone on which he received these robocalls from Defendant. Even assuming arguendo that Plaintiff received the inbound calls for "free", which Plaintiff repeatedly testified to the contrary, Plaintiff still would be obligated to pay for his outbound calls, which was an inseparable function of the TextMe app on his mobile device. In other words, Plaintiff was also charged for these calls because he paid for this telephone service, he paid his Wi-Fi provider for the data, he paid his power company for the electricity, he paid his cell phone company for the cellular telephone, and he paid TextMe for the pre-paid credits in order to use this phone number. Nothing about these facts suggests free or no charge.

Defendant's improperly introduced and self-serving declaration of Ms. Hernandez is not enough to overcome all the other evidence that demonstrate that Plaintiff's cell phone is *both* connected to a cellular telephone service *and* is charged for each call. On top of that, there is simply no legal reason why Defendant's automated calls to Plaintiff's cell phone should escape TCPA liability. The Telephone Consumer Protect Act is designed to protect consumers. Its legislative purpose was to protect a person's right to privacy. Given this goal of the TCPA to

protect consumers from invasions of privacy on their mobile devices, together with the legal standard that Defendant "do more than simply show that there is some metaphysical doubt as to the material facts," Plaintiff's motion for summary judgment should be granted. Recently, a Connecticut District Court provided a compelling explanation in a very similar case stating, "there is no apparent conceivable reason on the record why the use of a VoIP number to connect to a cell phone should be treated differently from a direct call to a cell phone, at least where, as here, the caller informs the debt collector that the number connects to a cell phone." *Ghawi v. Law Offices Howard Lee Schiff, P.C.*, 2015 WL 6958010, at *4 (D.Conn. Nov. 10, 2015). Here, too, Plaintiff repeatedly informed Defendant's representatives that they were calling his cell phone and here, too, Defendant should be found liable for violating the TCPA and Wis. Stat. § 995.50. PSPFF ¶¶ 12, 87.  ECF No. 18-11, p. 20-21.

> **D.** **The evidence demonstrates that Defendant's repeated robocalls to Plaintiff's cell phone frustrated and upset Plaintiff greatly because they were highly offensive to any reasonable person and invaded Plaintiff's reasonable expectation of privacy in his home.**

Defendant called Plaintiff 63 times in 12 days in an attempt to collect a debt that was not his. PSPFF ¶¶64, 88. Throughout the 12 days that Defendant was calling Plaintiff, Plaintiff's cell phone repeatedly rang while he was at home resting, trying to sleep, eating a meal, or simply trying to relax in the peace and solitude of his own home. PSPFF ¶70. These are places that are private to Plaintiff, and where Plaintiff should be free from the nonstop ringing of his cellular telephone—especially by Defendant who had neither the consent, nor the reasonable belief that it had his consent, to make these automated calls to Plaintiff. Defendant's repeated calls to Plaintiff were per se offensive and unreasonably invaded his daily life, especially given that he did not owe any debt to Defendant and he was the wrong party to be calling. PSPFF ¶68. No reasonable

finder of fact could conclude otherwise.

Again, Wis. Stat. § 995.50 provides, in pertinent part:

> (1) The right of privacy is recognized in this state. One whose privacy is unreasonably invaded is entitled to the following relief:
>> (a) Equitable relief to prevent and restrain such invasion, excluding prior restraint against constitutionally protected communication privately and through the public media;
>> (b) Compensatory damages based either on plaintiff's loss or defendant's unjust enrichment; and
>> (c) A reasonable amount for attorney fees.
> (2) In this section, "invasion of privacy" means any of the following:
>> (a) Intrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass.
> ...

The uncontroverted evidence in this case establishes a clear violation of Wis. Stat. § 995.50(2)(a) because:

1. a reasonable person would consider Plaintiff's home as *private*, and

2. making 63 illegal and automated calls to Plaintiff's cell phone in 12 days without his consent, and when he was the wrong person, demonstrates that this intrusion was *highly offensive*.

It is no wonder why Plaintiff responded the way that he did in some of his recorded calls with Defendant. After listening to Defendant blow up his phone with robocalls for no reason, and after repeatedly requesting that Defendant stop calling him, Plaintiff was driven into complete frustration and testified that he became very emotional. PSPFF ¶90. Defendant points to some of Plaintiff's statements during calls he had with Defendant while he was in this state of irritation and it argues that Plaintiff wanted more calls from Defendant so that it would have to pay a bigger fine. ECF No. 22, p.15. This argument is a distraction and takes those calls completely out

- 18 -

of context. Defendant altogether ignores the first conversations Plaintiff had with Defendant wherein he politely asked Defendant to take his number out of their system and/or to put him on the do-not-call list. ECF No. 11 ¶¶ 5-40.When Defendant ignored Plaintiff and continued to call, it drove him to say things that he later regretted because he was trying everything he could to get the calls to stop. ECF No. 29 ¶90. No one should be put through dozens of robocalls, especially someone who did not even owe the debt that Defendant was trying to collect. Even so, Plaintiff's natural reaction to these exasperating robocalls from Defendant provides no defensive shelter to Defendant under the TCPA.

It is self-evident that 63 robocalls to a *wrong* party in 12 days, after being repeatedly told that he was the wrong party and to stop, is highly offensive to any reasonable person--without a metaphysical doubt.

## IV.     CONCLUSION

Defendant's attempt to create a genuine issue of material fact has failed. The overwhelming evidence that Defendant made these calls to Plaintiff's cell phone cannot reasonably be disputed. In response to this overwhelming evidence, Defendant has attempted to escape liability with self-serving declarations from witnesses that have never been disclosed. Not only are these self-serving declarations unreliable and insufficient to thwart Plaintiff's summary judgment motion, but also they should be stricken because these witnesses were never disclosed. Regardless of Defendant's undisclosed witnesses and last-minute declarations, Plaintiff has proven his case. There is no genuine dispute over any material fact. Accordingly, Plaintiff respectfully requests that the Court grant the relief requested in his Motion for Summary Judgment against Defendant.

Dated: June 5, 2017                                    Respectfully Submitted,

**BARRY & HELWIG, LLC**

By:  **s/Patrick J. Helwig**
Patrick J. Helwig, Esq.
WI Attorney I.D. #1081347
Peter F. Barry, Esq.
WI Attorney I.D. #1044951
2701 University Ave SE, Suite 209
Minneapolis, MN 55414-3236
Telephone:  (612) 379-8800
Facsimile: (612) 379-8810
phelwig@lawpoint.com
pbarry@lawpoint.com
**Attorneys for Plaintiff**